## NORTON SHORES POLICE DEPARTMENT

**Official Complaint**
Page 1

| Complainants Name  INTERNAL | | Control Number  IA 2010-13 | |
|---|---|---|---|
| Address | | Assigned Investigator  D.Shaw | ☐ Inquiry  ☐ Informal  X Formal |
| Phone Number/ E-mail | | Reviewed/Assigned by:  D.Shaw | Date  09/29/2010 |
| Date of Incident | Time of Incident | Location of Incident | |
| Employee(s) Involved  Lt. Tim LaVigne | | | |

**NARRATIVE (provide detailed description of the incident complaint):**

On September 29, 2010 at approximately 14:00 hrs, Ofc Tony Nanna came into my office and stated that he had something he needed to show me. He was visibly shaking and obviously very upset. I walked into his office and he closed the door. He explained that approx. one year ago he had learned that his wife was in a "texting relationship" with another man. The event nearly caused a divorce; however, they went to counseling and seemed to work things out.

Tony stated that he received word from a friend that his wife was apparently texting another man again and he just learned who it was – his supervisor, Lt. Tim LaVigne. Tony had accessed his cellular phone records, which include his wife phone, and found numerous texts between his wife (231-578-0503) and Lt LaVigne's city issued cell phone (231-578-8152). Prior to notifying me, Tony had called his wife and confronted her about the texts. At first she denied texting LaVigne; however, after being told of the records, admitted that they had been communicating.

I told Tony that he should leave for the day to avoid confrontation with Lt LaVigne. He also locked his department issued handgun in his desk. Tony stated that he was so upset that he was not fit to drive, so he was going to call Ofc Wasilewski to pick him up. Unfortunately, prior to being able to arrange a ride, Lt. LaVigne entered Tony's office. I asked LaVigne to step back into his office and advised that it was not a good time to attempt to talk to him; however, LaVigne re-entered Nanna's office.

LaVigne told Nanna "it's not what you think." He stated that he had only been texting with Nanna's wife and had "never done anything with her." He clarified by making the statement "We've never met up," and later said "I've never been alone in the same room with her." He said that the texting had gotten out of hand and that it would stop. LaVigne also told Nanna that it's no different than what he has been doing on his phone – i.e. texting other women. Nanna

NOTICE: This document is considered to be an official police report. Knowingly filing a false police report may be a violation of Michigan Statute 750.411a.

| Complainants Signature | | Date | |
|---|---|---|---|
| Received by | | ID# | Date / Time |

**NORTON SHORES POLICE DEPARTMENT**  Official Complaint
Page 2

responded that he does text other women, but not his boss' wife. Nanna left for the day and later requested to take the rest of the week off with vacation leave.

STATUS:

OPEN, pending investigation

NOTICE: This document is considered to be an official police report. Knowingly filing a false police report may be a violation of Michigan Statute750.411a.

| Complainants Signature | | Date | |
|---|---|---|---|
| Received by | ID# | Date / Time | |

# Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 3 |
| Assigned Investigator | Badge # |
| D Shaw | |

INVESTIGATION:

On September 30, 2010, I contacted SPRINT and learned that in order to obtain text data the account holder (Jerry Bartoszek) had to submit a notarized request or a subpoena for the records. The completed the request form and asked Bartoszek to sign. The form was notarized and then submitted via fax to Sprint Security.

Nanna provided me with a copy of the text records from Lisa's phone, as the phone was in his name. The records indicated that there was significant texting activity between Lisa and LaVigne. I also reviewed the City's cellular bills for June 20 – September 19 and found that there was one cell phone call from Lisa to LaVigne on July 11, 2010; however, I believe this call occurred when Tony was in the hospital and may be legitimate.

INTERVIEW (Tony NANNA):

On October 1, 2010, I met with Tony at the Coffee House on Seminole. He advised that he wanted to take the next week off on Vacation leave to work out his marital situation. Apparently he has decided to file for divorce. According to Tony, he had learned that Lisa was texting another man earlier in the year, which nearly caused a divorce then, but the sought counseling.

Tony advised that he had talked to his wife about the texting and she admitted to texting LaVigne. She told him in one case LaVigne had seen her in a bar/restaurant and he texted her a picture of a beer bottle. She was apparently drinking water and sent him a photo of the bottle. LaVigne apparently send a text indicated that he wanted a picture of her, not the bottle.

He also said she told him that they did meet together one time in September, but they "didn't do anything." According to Tony, Lisa said that she and LaVigne had been texting in the morning and Tim requested to meet with her. She was apparently on lunch break (5th/3rd Bank on Harvey) and told him she was in the parking lot. He responded that he was in Fruitport on a case and would meet her there.

Recently, Tony and Lisa attended a wedding reception. During the reception, the two of them got into an argument. Lisa told Tony that she was leaving, which he would not allow as she was drinking. She did eventually leave in their vehicle, but returned about an hour later. When Tony asked what she did, she indicated that she went down the road

| Investigators Signature | Badge # | Date |
|---|---|---|
| Reviewed by | Badge # | Date |

## Norton Shores Police Department

**Official Complaint – Supplement Report**

| Control Number | Page |
|---|---|
| IA 2010-13 | 4 |
| Assigned Investigator | Badge # |
| D Shaw | |

to think. Tony found numerous texts on their phone records during this time indicating that she was texting with LaVigne. She did admit to these texts as well.

Tony asked if he was under investigation for any violations. I advised him that I requested text records for both his and LaVigne's assigned phones based on the conversation on September 29, 2010 – that both of them have been texting women on their City issued cell phones. He said that he was told by LaVigne that he could use the phone for personal use as he was paying taxes on it and it was a "perk" for being on-call. I explained that he may be correct; however, the permission to utilize the phone for personal business does not allow inappropriate personal use. He admitted to having a picture of an old girlfriend on his phone, which he did show me; however, the lady was fully clothed and not in a suggestive pose. He admitted to receiving items via email or text that would be considered inappropriate; however, these were deleted, though he did admit to showing them to LaVigne.

**INFORMATION:**

On October 1, 2010, Lt LaVigne came into my office and shut the door. He apologized for causing a problem within the Department and assured me that the texting has stopped. In fact, he stated that he received a phone call from Lisa (on a different telephone) and he told her to stop calling him. He said that this was his fault and that it "just got out of hand."

LaVigne said that he doesn't want Tony to be removed from the Detective Bureau and feels that the two of them could work together professionally, indicating that Tony didn't have to like him, but they could work together. He stated that he didn't know why Tony was so upset as he (Tony) does the same thing – texting other women. LaVigne stated that previously he has seen inappropriate material on Tony's City provided cell phone, in one case a photo of an old girlfriend. It should be noted that this possible violation was not reported to me.

LaVigne admitted that some of the texts were sexual in nature. He reiterated that this was simply flirtatious texting that got out of hand and that he never had physical contact with Lisa. Again, he stated that he had "never been in the same room alone with her (Lisa)".

I advised that I had requested the data from Sprint and would address the issue once received.

| Investigators Signature | Badge # | Date |
|---|---|---|
| | | |
| Reviewed by | Badge # | Date |

# Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 5 |
| Assigned Investigator | Badge # |
| D Shaw | |

**STATUS:**

OPEN

| Investigators Signature | Badge # | Date |
|---|---|---|
| Reviewed by | Badge # | Date |

## Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 6 |
| Assigned Investigator | Badge # |
| D Shaw | |

**INFORMATION:**

On October 13, 2010, I called Sprint Security to ask about status of the records request. I was advised that the request was received on September 30, 2010 and had been assigned to an investigator for processing – which would take 5-6 days. I advise that the request has already taken 13 days and was told "they were very busy." I was then informed that the investigator hoped to have the records in the mail late 10/13 or on 10/14/10. Unfortunately, I was also told that I would not be able to receive the actual text messages that were sent due to changes in FCC regulations. I would only receive date, time, and the phone numbers involved.

**ADMINISTRATIVE LEAVE:**

On October 15, 2010 at 1445 hrs., I spoke with LaVigne in his office. I advised that I had still not received the text records and that Tony had indicated that he was coming back to work on Monday, October 18, 2010. Due to the fact that this investigation was not completed, I could not permit the two of them to work together; therefore, advised him to stay home on paid administrative leave until I contacted him to return. He immediately left the building.

**STATUS:**

OPEN

| Investigators Signature | Badge # | Date |
|---|---|---|
| | | |
| Reviewed by | Badge # | Date |
| | | |

| Norton Shores Police Department | Control Number<br>IA 2010-13 | Page<br>7 |
|---|---|---|
| Official Complaint – Supplement Report | Assigned Investigator<br>D Shaw | Badge # |

**TEXT RECORDS REVIEW:**

On October 18, 2010, Jerry Bartoszek, came into my office and gave me an unopened envelope from Sprint. I opened the envelope and found a copy of my records request form, a letter explaining the records, and a CD-ROM disk. The CD-ROM contained two folders, one for 231-578-8152 and one for 231-638-2346.

I opened the folder for LaVigne's phone which contained an Excel file of the text records. I sorted the file by senders tx and receivers tx and copied only those calls involving LaVigne's phone and Lisa's phone (see attached). There were a total of 493 texts between the two phones from July 10, 2010 through September 29, 2010. In July, there were 29 texts, all during the period of time Tony was in the hospital after minor surgery. There were 13 on August 13, 2010 (1432 – 1458 hrs) all while Tim was on-duty. The majority of the texts (451) occurred September 9 – 29, 2010, of which 342 of them occurred while LaVigne was on-duty.

**INTERVIEW (LaVIGNE):**

I scheduled a meeting with LaVigne for October 19, 2010 at 1430 hrs to discuss the text records. Prior to asking any questions, I offered LaVigne an opportunity to have a representative with him. He declined. LaVigne was visibly shaken; however, he was coherent and able to comprehend and answer questions.

I verbally advised him of the three different cases I was now investigating (2010-13, 15, and 16). I then provided him with his Administrative Rights form, which includes Garrity Rights statements. LaVigne asked if this was a "witch hunt" and I explained that each of the complaints was initiated based on separate circumstances. LaVigne initialed all of the statements and signed the document.

With respect to this case, I explained my review of the text messages and the fact there were hundreds of them while he was on-duty. LaVigne again stated that he was sorry for putting me and the Department in this situation and he takes full responsibility for his actions. He admitted to texting Lisa Nanna while on-duty and indicated that it simply got out of hand. He stated that he gets bored in his office typing reports, so he texts women to pass time. He indicated that Lisa isn't the only woman that he texts.

I asked him if he simply texted with Lisa, or if he met with her. He reiterated that he had never been alone with her. LaVigne stated that he has been a good employee for the City

| Investigators Signature | Badge # | Date |
|---|---|---|
| Reviewed by | Badge # | Date |

12

# Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 8 |
| Assigned Investigator | Badge # |
| D Shaw | |

and hopes that this is taken into account as this case moves forward. He did indicate that he has heard that Tony has been spreading inaccurate information about this case, specifically that he has had sexual relations with Lisa, which he reiterated is totally false. I advised him that I had spoken with Tony about this (as I had heard rumor of the same) and told him the importance of using unambiguous terms/phrases (i.e. messing around, cheating, etc.) rather than simply stating the known truth – texting. LaVigne mentioned that he had spoken with an attorney; however, I was not clear if this was in regards to his employment or Tony's actions.

I told LaVigne that I would complete my investigation and then turn it over to City Administrator and Director of Administrative Services. I did tell him that he should expect the scheduling of a Determination Hearing in accordance with out procedures, as it is possible disciplinary action will involve loss of property rights. He asked when this may be and I advised I'd try to have it done by the end of the week.

INTERVIEW (Lisa NANNA):

On October 20, 2010, at 1030 hrs., I met with Lisa NANNA at Brooklyn Bagels on Whitehall Rd in North Muskegon. Also in attendance was Lt Jon Gale. I advised Lisa that this was not a criminal case and that I only needed to speak with her to verify some issues involved in this internal investigation. She agreed to speak with me stating she had nothing to hide.

Lisa said that the texting between the two of them didn't get serious until September. I asked when it started and she said it started with him posting private messages to her Facebook page. She said that the messages were not about what she posted on her wall (which apparently is normal for the Facebook community), but were vague or suggestive in nature. She then described an incident when she received a text from him with a picture of a beer bottle. She was with some people from her son's PTA and was drinking water, so she returned the text with a photo of the water bottle indicated that she wished she could have a beer as well. LaVigne responded something to the effect of "is that the best photo you have?" She responded "what do you want?" and he answered "you."

When asked if the two of them ever met privately, she said that on one occasion she was getting texts from LaVigne and he asked to meet with her. She indicated that she was at work, but on lunch. LaVigne indicated that he was in Fruitport on some cases, so they agreed to meet in the parking lot. She said they talked for the 10 minutes remaining on her lunch period. She said during that time, LaVigne kept looking around like he was

| Investigators Signature | Badge # | Date |
|---|---|---|
| Reviewed by | Badge # | Date |

# Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 9 |

| Assigned Investigator | Badge # |
|---|---|
| D Shaw | |

being watched. He even asked if she was setting him up. She said the two of them remained in their respective vehicles, until she went back into the bank. I asked her if she remembered the date of this meeting and she said she didn't but said we should be able to get the date from cell phone records, as this was the only time she actually called LaVigne.

Lisa stated that her marriage with Tony has been "over" for about a year. She said that she got "pulled into" texting with LaVigne as she appreciated the attention she was getting. She did ask why this was the Department's business and I explained the impact this situation has had on the workplace.

INVESTIGATION:

I rechecked the call logs for the City's Sprint cellular phones and found that there was an additional call from Lisa Nanna's cell phone (231-578-0503) to LaVigne's phone (231-578-8152) on September 21, 2010 at 11:35 a.m. (5 minute duration). This would seem to corroborate Lisa's statement that she met with LaVigne on that date, contrary to LaVigne's ascertain that he never met with Lisa alone.

CONCLUSION OF FACT:

Based on the investigation, I find that Lt. LaVigne's actions substantiate violations of the following Rules and Regulations:

ARTICLE VIII – COMMUNICATIONS AND CORRESPONDENCE

2. No officer or civilian of the department shall make false official reports or enter or cause to be entered in any department book, record, or report any inaccurate, false or improper information.

ARTICLE XII – PERSONAL CONDUCT

1. Officers and civilians shall conduct themselves in their private and professional lives in such a manner as to avoid bringing themselves or the department into disrepute.

16. Officers and civilians are prohibited from engaging in the following activities while on duty with the exception noted herein:

| Investigators Signature | Badge # | Date |
|---|---|---|
| | | |
| Reviewed by | Badge # | Date |
| | | |

## Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 10 |
| Assigned Investigator | Badge # |
| D Shaw | |

        b.    Recreational reading.
        c.    Conducting private business.

19.    Department personnel shall avoid actions which give the appearance of impropriety. Activities on or off duty engaged in department personnel which indicate instability of character or personality shall subject the officer to disciplinary action.

25.    Certain acts, some of which are not wrongful in themselves, are not proper to members of this department because they unnecessarily embarrass the department publicly, or tend to impede the attainment of police objectives.

ARTICLE XIII - PERFORMANCE OF DUTY

12.    Officers and civilians shall conduct themselves in a manner that will foster the greatest harmony and cooperation between each other and between other governmental departments or agencies.

13.    Any officer of the department who shall, in the performance of his official duties, display reluctance to properly perform his assigned duties, or who acts in a manner tending to bring discredit upon himself or the department, or who fails to assume responsibility or exercise diligence, intelligence and interest in the pursuit of his duties, or whose actions or performance in a position, rank, or assignment are below acceptable standards, may be deemed incompetent and shall be subject to disciplinary action.

In addition to the above stated rules, Lt LaVigne's actions are contrary to the IACP Code of Ethics adopted by the Department, which he agreed to abide by, specifically the following excerpt:

> "I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department..."

| Investigators Signature | Badge # | Date |
|---|---|---|
| Reviewed by | Badge # | Date |

# Norton Shores Police Department

Official Complaint – Supplement Report

| Control Number | Page |
|---|---|
| IA 2010-13 | 11 |
| Assigned Investigator | Badge # |
| D Shaw | |

**INFORMATION:**

On October 20, 2010 at approx 1400 hrs., I met with Admin Services Director Larks and advised her of my findings. We then had a telephone conference with the City's labor attorney, Rob Debault. It was agreed that Ms Larks should schedule a determination hearing. She later indicated that she scheduled the hearing for October 26, 2010 at 3pm in the small conference room. She will contact LaVigne and send him a confirmation letter.

**STATUS:**

OPEN, Pending Disciplinary Action

| Investigators Signature | Badge # | Date |
|---|---|---|
| | | |
| Reviewed by | Badge # | Date |

16

# Norton Shores Police Department

Official Complaint – Officer Notification / Rights

| Control Number | Page |
|---|---|
| IA 2010-13 / 15 / 16 | |
| Assigned Investigator | Badge # |
| D Shaw | |

## NOTIFICATION

Initials

On the below date, I was notified by the assigned investigator of this investigation and the allegations made against me.    _T. L._

I was provided a copy of the complaint.    _T. L._

I have been notified that pursuant to the collective bargaining agreement, my in-car video/audio media regarding this investigation.    _T. L._

## ADMINSTRATIVE RIGHTS

I understand that I am permitted to have a representative with me during any interview concerning allegations of misconduct.    _T. L._

I understand that I am required to submit this statement/report as a condition of continued employment. In view of possible job forfeiture, I have no alternative but to abide by this order and to submit this involuntary statement/report (MSA 15.391, et sec.).    _T. L._

I understand that this involuntary statement/report can not be used against me in a criminal proceeding; however, may be used against me in any subsequent disciplinary proceedings.    _T. L._

I understand that this involuntary statement/report is considered confidential communication and is not open to public inspection, but may be disclosed by the Department under 1 or more of the circumstances below:    _T. L._

    *(a) With my written consent*

    *(b) To a prosecuting attorney pursuant to a search warrant, subpoena, or court order, including an investigative subpoena; however, the prosecuting attorney shall not disclose the contents of the statement except to a law enforcement agency working with the prosecuting attorney or as ordered by the court having jurisdiction over the criminal matter or, as constitutionally required, to the defendant in a criminal case.*

    *(c) To officers of, or legal counsel for, the Department or the Police Officers Labor Council, or both, for use in an administrative or legal proceeding involving my employment status with the Department, or to defend the Department or me in a criminal action. However, a person who receives this involuntary statement shall not disclose the statement for any reason not allowed by Law,*

3

# Norton Shores Police Department

Official Complaint – Officer Notification / Rights

| Control Number | Page |
|---|---|
| IA 2010-13 / 15 / 16 | |
| Assigned Investigator | Badge # |
| D Shaw | |

*or make it available for public inspection, without my written consent.*

*(d) To legal counsel for an individual or employing agency for use in a civil action against me or the Department. Until the close of discovery in that action, the court shall preserve by reasonable means the confidentiality of the involuntary statement, which may include granting protective orders in connection with discovery proceedings, holding in camera hearings, or ordering any person involved in the litigation not to disclose the involuntary statement without prior court approval.*

| Location of Interview | | Date | Time |
|---|---|---|---|
| Chief's Office | | 10/19/2010 | 1430 |
| Officer's Name | Signature | | |
| Timothy LaVigne | | | |
| Investigator's Name | Signature | | |
| Daniel Shaw | | | |
| Witness' Name | Signature | | |
| | | | |

## WRITTEN CONSENT FOR RELEASE

I hereby give my written consent to release the official police report, which includes my involuntary statement/report, to the Muskegon County Prosecutor's Office / Norton Shores City Attorney for the sole and expressed purpose of prosecuting the criminal case; with the understanding that this information may not be used in any criminal proceedings against me.

| Officer's Name | Signature | Date |
|---|---|---|
| | | |
| Witness' Name | Signature | Date |
| | | |

4

STATE OF MICHIGAN
County of _Muskegon_

I do solemnly swear (or affirm) that I have read the code of Ethics and will faithfully adhere to said Code of Ethics as a _Police Officer_ in and for the _City_ of _Norton Shores_ County of _Muskegon_ and State of Michigan.

CODE OF ETHICS

AS A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality, and justice.

I WILL keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others, honest in thought and deed in both my personal and official life, I will be exemplary in observing the laws of the land and the regulations of my agency. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will constantly strive to acheive these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

_Timothy A. LaVigne_

Subscribed and sworn to before me, this _26th_ day of _July_ 19_90_

_Dorothy J. Hayes_
_City Clerk_
_Muskegon_ County, Michigan.